IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KENNETH MITCHELL,

        Petitioner,

    v.

JEAN HILL, Superintendent,
Snake River Correctional Institution,

        Respondent.

Civil No. 06-844-BR

OPINION AND ORDER

**TODD H. GROVER**
1012 NW Wall
Suite 206
Bend, OR  97701

      Attorney for Petitioner

**JOHN R. KROGER**
Attorney General
**SUMMER R. GLEASON**
Senior Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301

      Attorneys for Respondent

1 - OPINION AND ORDER -

**BROWN, Judge**.

Petitioner bring this habeas corpus action pursuant to 28 U.S.C. § 2254.  For the reasons that follow, the Court **GRANTS** Petitioner's request to expand the record, **DENIES** Petitioner's request for evidentiary hearing, and **DENIES** the Petition for Writ of Habeas Corpus.

## BACKGROUND

On April 23, 1997, a Deschutes County grand jury indicted Petitioner on two counts of Sodomy in the First Degree, two counts of Sexual Abuse in the First Degree, Sodomy in the Second Degree, Rape in the First Degree, Assault in the Second Degree, Rape in the Third Degree, and Sodomy in the Third Degree.  The offenses were alleged to have been committed against Petitioner's niece, "CT," and nephew, "NV," when they were sent to stay at Petitioner's cabin on separate occasions.  CT was fourteen and NV was twelve at the time of the incidents.

The case was tried to a jury.  The jury convicted Petitioner on all counts charged in the indictment except for the Assault in the Second Degree charge.

I.    **Trial Evidence**

    A.    **Evidence Related to CT**

At trial, CT testified that, during the summer of 1995, she and her sister spent approximately three or four weeks with Petitioner at his cabin in La Pine, Oregon.  According to CT Petitioner sexually abused her on a number of occasions during this period.  CT also testified that Petitioner cut her leg and threatened to kill her if she ever reported the abuse during one of the sexual encounters.

CT testified she did not report the sexual abuse to her parents or the authorities for approximately one year because she feared no one would believe her.  When CT did disclose the abuse, CT's grandmother (Petitioner's mother) and father did not believe her, and CT ran away.

CT's father found her, picked her up, and took her to his house where her grandmother was present waiting for her with Petitioner on the telephone.  CT was offered a thousand dollars to make a tape recanting her allegations of abuse.  Although CT made a recording recanting her accusations during a meeting with Petitioner's attorney, CT testified at trial that she was forced to make the tape by her grandmother and father, that the information on it was false, and that Petitioner had, in fact,

molested her.  The State presented testimony from other witnesses to buttress CT's testimony.

Petitioner testified on his own behalf and denied CT's allegations.  Petitioner also called his brother (CT's father) who testified that CT never mentioned any abuse at the time she was staying with Petitioner and that he did not threaten or coerce CT in order to prompt her to recant.  When asked about CT's character for truthfulness, her father testified it is "50-50."

Petitioner also presented testimony from his parents (and CT and NV's grandparents), Francis and Marvel Mitchell to impeach CT. Francis Marvel testified CT "is a liar and a thief" and that her reputation for truthfulness is not good.  Marvel Mitchell testified that she knows CT very well and that, in her opinion, CT "is not a truthful person at all."  Marvel Mitchell also denied threatening or coercing CT to get her to recant.

**B.    Evidence Related to NV**

NV testified he was twelve years old in the summer of 1992, when he spent two weeks with Petitioner at his cabin in La Pine, Oregon.  During the second week of his visit, NV testified Petitioner began making sexual advances toward him.  He testified Petitioner then engaged him in a number of sexual acts.

NV testified that, following the first encounter, he rode his bike to the store, called his mother on the telephone, and pleaded with her to bring him home.  He tried to call his parents on one

4 - OPINION AND ORDER -

or more other occasions, but was unable to reach him.  During the
second week of his visit, NV testified that Francis and Marvel
Mitchell came for a visit, and he asked them to take him home.
They declined and told him he should wait a few days for his
parents to arrive.  NV testified he did not, however, report the
abuse to his grandparents because he feared they would not believe
him.

A few days later, NV's father picked him up and took him
home.  NV testified he did not report the abuse to his father or
anyone else because he was ashamed.  After he heard CT had accused
Petitioner of abusing her years later, NV then told his mother
about the abuse.

Petitioner testified in his own defense as to the charges
involving NV.  He denied any sexual contact with NV during the
summer of 1992.  Petitioner testified that a few years later, in
1994, he lived for a period in a trailer park on the outskirts of
the Eugene/Springfield area and that NV continued to visit him
there at that time.  He testified that he and NV went to the coast
together and camped together on more than one occasion.

Francis Mitchell testified that, in his opinion, NV's
character for truthfulness "isn't good," and that his reputation
in the community for truthfulness "is not good."  He further
stated that, in 1992, he and his wife had a close relationship
with NV, and that when they visited NV and Petitioner in La Pine,

he did not sense anything was wrong.  According to Francis Mitchell, NV never said he wanted to go home.

Marvel Mitchell's testimony was similar.  She stated that, in her opinion, NV "was not a truthful child."  Additionally, she testified that NV had a reputation in the community for being untruthful.  Marvel Mitchell testified that when she visited NV and Petitioner in La Pine in 1992, she did not see anything amiss and that when she asked NV whether he liked staying with Petitioner, NV responded he was having "lots of fun."  As noted, however, the jury convicted Petitioner on all but one charge notwithstanding the affirmative challenges to the credibility of CT and NV.

## II.  Subsequent Procedural History

Following the conviction, the trial judge imposed a combination of consecutive and concurrent sentences for a total of 208 months of imprisonment.  Petitioner directly appealed his sentence, but the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review.  *State v. Mitchell*, 180 Or. App. 394, 44 P.3d 624 (2002), *rev. denied*, 334 Or. 289, 49 P.3d 798 (2002).

Petitioner then sought state post-conviction relief ("PCR"). Following an evidentiary hearing, the PCR trial judge denied relief.  Petitioner appealed, but the Oregon Court of Appeals

summarily affirmed, and the Oregon Supreme Court denied review. Respondent's Exhibit ("Resp. Exh.") 133, 136.

On June 14, 2006, Petitioner filed his habeas corpus Petition in this Court.   This Court appointed an attorney to represent Petitioner, who filed Petitioner's First Amended Petition for Writ of Habeas Corpus on December 22, 2006.   In his Amended Petition, Petitioner alleges his trial counsel provided constitutionally ineffective assistance by failing to:

    1.   Call Terry Mitchell to testify that CT said the allegations against Petitioner were false;

    2.   Call a man named "Robert" to testify that CT threatened to report his sexual advances unless he gave her money;"

    3.   Call NV's brother to testify that NV came to his house even though NV knew Petitioner was staying there;

    4.   Call NV's mother to testify about whether NV visited Petitioner at times after the abuse;

    5.   Obtain school records for CT and NV;

    6.   Obtain juvenile records for CT from a 1997 Lane County incident.

Respondent contends, and Petitioner concedes, that the ineffective assistance of counsel claim alleged in the amended petition is procedurally defaulted.   Petitioner argues, however, that his actual innocence excuses the procedural default, such that this Court may consider the merits of his ineffective assistance of counsel claim.   Petitioner seeks to expand the

record to include evidence supporting his claim of actual innocence and, in addition, seeks an evidentiary hearing.

## DISCUSSION

### I.  Expansion of the Record

Petitioner moves, pursuant to Rule 7 of the Rules Governing Federal Habeas Cases, to expand the record in this case to include several affidavits.  Petitioner asserts the affidavits are necessary to show actual innocence excusing his procedural default.  Respondent objects because the evidence contained in the affidavits "is not credible."

Rule 7 allows district courts to expand the evidentiary record to include additional material relevant to the petition. Generally, 28 U.S.C. § 2254(e)(2) limits a habeas petitioner's ability to expand the record to the same extent that it limits the availability of an evidentiary hearing.  *Holland v. Jackson*, 542 U.S. 649, 652 (2004).  However, § 2254(e)(2) does not apply to expansion of the record to overcome a procedural default.  *Buckman v. Hall*, 2009 WL 204403 *1 (D. Or. 2009) (citations omitted).  In such a case, Rule 7 grants the district court discretion to expand the record.  *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986).

As Petitioner correctly notes, Respondent's objections go to the weight of the proposed affidavits, not their admissibility. Because the Court finds Petitioner's proposed affidavits helpful

to clarify the relevant facts of Petitioner's actual innocence claim, the request to expand the record under Rule 7 is GRANTED.

## II. Actual Innocence

### A. Legal Standards

The miscarriage of justice or actual innocence exception to procedural default is limited to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To be credible, a claim of actual innocence must be supported with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324.

The required evidence must create a colorable claim of actual innocence, that the petitioner is innocent of the charge for which he is incarcerated, as opposed to legal innocence as a result of legal error." *Id*. at 321. It is not enough that the evidence show the existence of reasonable doubt, a petitioner must show "that it is more likely than not that no 'reasonable juror' would have convicted him." *Id*. at 329; *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008) ("miscarriage of justice exception is limited to those *extraordinary* cases where the petitioner asserts

his innocence and establishes that the court cannot have confidence in the contrary finding of guilt"), *cert. denied*, 129 S.Ct. 2060 (2009) (emphasis in original); *Van Buskirk v. Baldwin*, 265 F.3d 1080, 1084 (9th Cir. 2001) ("the test is whether, with the new evidence, it is more likely than not that no reasonable juror would have found [petitioner] guilty").

   **B.    The "New" Evidence**

      **1.    Affidavits of Terry Mitchell**

      Terry Mitchell is Petitioner's nephew and CT's cousin. After Petitioner was formally charged but before trial, Terry Mitchell signed two affidavits, one dated October 1, 1997, and another dated February 2, 1998.

      In these affidavits, Terry Mitchell details a series of conversations he had with CT following her stay with Petitioner during the summer of 1995. According to Terry Mitchell, CT reported that she had fun in La Pine. She also told Terry Mitchell that, although she had made sexual advances toward Petitioner, he had rebuked her. CT later told Terry Mitchell she intended to falsely accuse Petitioner of sexual abuse, apparently at the urging of her mother, who harbored some grudge against Petitioner.

      In February 2007, Terry Mitchell signed a third affidavit. In it, he reaffirms and expands upon the averments

contained in his first two affidavits.  Additionally, he reports
he gave the first two affidavits to his grandmother, Marvel
Mitchell, with the understanding that she would pass them along to
Petitioner's attorney.  Terry Mitchell says he was not contacted
by Petitioner's attorney prior to trial.  Counsel for Petitioner
in this action avers that the two prior affidavits were located in
Petitioner's trial attorney's file materials.

    **2.    Affidavit of AT**

CT's sister, AT, also provided an affidavit, dated October 18, 2007. AT relates her recollection of the few weeks she and her sister spent with Petitioner in La Pine during the summer of 1995. AT avers that, during their stay, she did not witness any sexual contact between CT and Petitioner. There were a few incidents in which AT was outside of the cabin while CT and Petitioner were inside alone, but AT never had the sense that anything unusual occurred in her absence. AT recalls that when, after a few weeks, their parents returned to take CT and AT home, neither wanted to leave. AT also notes that from her experience growing up with CT, she knows CT can be dishonest and manipulative.

### C.    Analysis

The affidavits Petitioner offers in support of his *Schlup* claim do not present direct evidence of actual innocence. Instead, they constitute impeachment evidence that attacks the credibility of one of the victims, CT. The hearsay statements from Terry Mitchell are uncorroborated and contradicted by other testimony in the record, including the victims' testimony. AT's affidavit simply states she did not see anything that led her to believe Petitioner was abusing her sister at the time, and that she knows her sister to be dishonest and manipulative, which is not unlike the grandparents' testimony at trial.

The types of evidence previously found sufficient by courts to support a *Schlup* claim are far more reliable and probative of actual innocence that Petitioner's proffered affidavits. *See Majoy v. Roe*, 296 F.3d 770, 777 (9th Cir. 2002) (primary witness agaisnt petitioner later recanted his testimony); *Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997) (witness whose trial testimony led to petitioner's conviction later gave a sworn confession to the murder of which petitioner was convicted). Petitioner fails to meet his burden of demonstrating that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.[1] Moreover, this new evidence is qualitatively no different than the significant evidence the trial jury heard that was intended to impeach CT's testimony. The jury, however, had the authority and the opportunity to scrutinize CT's testimony and to choose to believe it in the fact of the impeachment evidence if they were persuaded beyond a reasonable doubt that it was credible.

Accordingly, Petitioner's procedural default is not excused and he is not entitled to habeas corpus relief in this Court.

---

[1]The Court does not hold that impeachment evidence is necessarily insufficient to support a claim of actual innocence under *Schlup*. Rather, the impeachment evidence offered by Petitioner in this case does not satisfy the requirements of *Schlup*.

### III. Request for Evidentiary Hearing

Petitioner also seeks an evidentiary hearing to determine the reliability of the evidence submitted in support of his actual innocence claim.  The decision to grant an evidentiary hearing on issues of actual innocence to excuse procedural default remains at the discretion of the district court under Rule 8(a).[2] *Schriro v. Landrigan*, 550 U.S. 465, 469 (2007); *House v. Bell*, 547 U.S. 518, 539 (2006).

Here, the Court finds an evidentiary hearing is not warranted.  The reliability of the actual innocence evidence presented by Petitioner is not at issue.  Even viewed in the light most favorable to Petitioner, the evidence is not sufficient to establish that it is more likely than not that no reasonable juror would have convicted Petitioner.  As such, Petitioner has "failed to show what ... an evidentiary hearing might reveal of material import on his assertion of actual innocence[,]" and an evidentiary hearing is not warranted. *Gandarela v. Johnson*, 286 F.3d 1080, 1087 (9th Cir. 2002) (evidentiary hearing unnecessary); *Griffin*, 350 F.3d at 966 (9th Cir. 2003) (hearing unnecessary when petitioner failed to establish that a hearing would produce

---

[2]"If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."  Rule 8(a), Rules Governing § 2254 Cases.

evidence more reliable or more probative than that already before the court).  Accordingly, Petitioner's request for an evidentiary hearing is DENIED.

### CONCLUSION

For these reasons, the Court **GRANTS** Petitioner's request to expand the record, **DENIES** Petitioner's request for an evidentiary hearing, and **DENIES** the Amended Petition for Writ of Habeas Corpus.

IT IS SO ORDERED.

DATED this __9th__ day of September, 2009.

_____/s/ Anna J. Brown_____
ANNA J. BROWN
United States District Judge